UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TYRESE COLEMAN BUGGS,

                 Petitioner,

v.                                     CASE NO. 2:09-cv-10449
                                     HONORABLE GERALD E. ROSEN

BARRY DAVIS,

                 Respondent.

_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
## DENYING A CERTIFICATE OF APPEALABILITY, BUT
## GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Petitioner Tyrese Coleman Buggs has filed a *pro se* application for the writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  The pleading challenges Petitioner's

state convictions for second-degree murder and possession of a firearm during the

commission of a felony (felony firearm).  Petitioner alleges that his trial and appellate

attorneys were ineffective, that he was denied his right to confront a witness, and that

the trial court abused its discretion by allowing a portion of the preliminary examination

to be read into the record.  Having reviewed the record, the Court finds that the state

court decisions adjudicating Petitioner's claims were objectively reasonable.

Accordingly, the habeas petition will be denied.

## I. BACKGROUND

### A.  The Facts

Petitioner was charged in Genesee County, Michigan with open murder, which

encompassed first-degree murder and second-degree murder.  The charges arose from

allegations that Petitioner shot and killed Frederick Cheatom, Jr., on August 24, 2001, in Flint, Michigan.

The sole eyewitness to the shooting was Larry Cobb, who observed a man come from behind the victim and shoot the victim in the back. Cobb was about 450 feet away from the shooting, but he thought that the shooter was wearing a green jersey with the number eight on it. He also thought the shooter was about 5'6" to 5'8" tall and 160 to 170 pounds. Cobb informed the police that the shooter appeared to drop something in a bush as he left the area. The police investigated the area pointed out to them by Cobb. They found a lime green tee shirt and a blue football jersey with the number 8 and the name Aikman on the back of it.

Cheatom's girlfriend, Carlett Macklin Gardner, arrived on the scene shortly after Cheatom was shot. She saw a man walking away from Cheatom's body. She described the man to the police as 5'6" tall, 160 pounds, dark complected, short Afro, and wearing a blue Dallas Cowboys football jersey with the name Aikman and the number eight on it.

Petitioner was not apprehended right away, and on November 3, 2001, he was the victim of a shooting in an unrelated incident. The police found a .45 caliber gun and several casings at the scene of that crime.

No further developments occurred in the case until March of 2003 when Detective Sergeant Mark Reaves of the Michigan State Police reviewed the case while working on a task force devoted to solving "cold" cases. He sent evidence that the police had preserved to the state crime lab for analysis. Petitioner's name emerged as a possible suspect. Detective Reaves then prepared a photo array, which he asked

2

Larry Cobb to view on July 7, 2003. Cobb identified Petitioner in the array and said that he was eighty per cent sure of his choice. Petitioner subsequently was arrested, and a DNA sample was taken from him.

A live line-up was conducted in January of 2004. Cobb eliminated four of the six men in the line-up. Petitioner was one of the two men remaining in the array when the police stopped the procedure. Cobb selected the other man, who was in position number 4, but on the way home from the line-up, he told Sergeant Jowanne Carrigan that he thought the shooter was #6, which was Petitioner.

Sergeant Reaves subsequently interviewed Petitioner's friend, Corey Wilson, who had been charged with a different crime. Wilson informed Sergeant Reaves that Petitioner had told him about the shooting. According to Wilson, Petitioner said he shot the man because the man's brother shot his (Petitioner's) brother. Petitioner also told Wilson that the police already had the murder weapon, having acquired it when Petitioner was shot.

The police located the gun and sent it to the lab for analysis. Detective Sergeant Ronald Ainslie confirmed that the bullet removed from Frederick Cheatom and the three .45 caliber casings found near Cheatom's body on August 24, 2001, matched the gun. Forensic scientist Jeffrey Nye confirmed that Petitioner's DNA was present on the gun, as well as, on the blue football jersey.

Finally, on July 21, 2004, Sergeant Jowanne Carrigan interviewed Laron Burns, who was Petitioner's cell mate at the Genesee County Jail. According to Burns, Petitioner admitted to him that he ran up to the victim and shot him.

**B.  The Trial, Sentence, and Appeals**

Petitioner was tried in Genesee County Circuit Court in August of 2004.  The prosecutor established the facts outlined above and argued that Petitioner possessed the motive, means, and opportunity to kill Cheatom and was guilty of first-degree murder.

Petitioner testified in his own defense and stated that he was 5'3" tall and 125 - 130 pounds in 2001.  He denied shooting Cheatom.  He said that he had never heard of Frederick Cheatom before this case arose and that he did not know his brother's killer had a brother by that name.  He also denied telling Corey Wilson and Laron Burns that he shot Cheatom.  He admitted that the football jersey in evidence belonged to him, but he denied ownership of the gun in evidence.  He claimed that someone stole his laundry at a laundromat in 2001 and that the person later wore the football jersey and used the gun to kill Cheatom.  Defense counsel argued to the jury that Corey Wilson and Laron Burns were not credible witnesses and that the prosecution had failed to prove its case beyond a reasonable doubt.

On August 25, 2004, a Genesee County Circuit Court jury found Petitioner guilty of murder in the second degree, Mich. Comp. Laws § 750.317, and felony firearm, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner to two years in prison for the felony firearm conviction with 277 days of credit for time served.  Petitioner received a consecutive sentence of 375 to 720 months (thirty-one years, three months, to sixty years) for the murder conviction.

In an appeal of right, Petitioner argued that (1) defense counsel was ineffective for not requesting a hearing on the in-court identification of him, (2) he was denied his

4

constitutional right to confront Laron Burns during his cross-examination of Burns, and (3) the trial court abused its discretion by permitting Carlett Macklin Gardner's testimony from the preliminary examination to be read into the record.  The Michigan Court of Appeals was unpersuaded by these arguments and affirmed Petitioner's convictions in an unpublished opinion.  *See People v. Buggs*, No. 258347 (Mich. Ct. App. Jan. 12, 2006).  On June 26, 2006, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Buggs*, 475 Mich. 887 (2006) (table).

On or about March 30, 2007, Petitioner filed a motion for relief from judgment, which the trial court denied in a reasoned opinion on May 11, 2007.  In an appeal from the trial court's decision, Petitioner argued that defense counsel was ineffective for failing to (1) request appointment of a DNA expert and (2) object to the pathologist's testimony.  Petitioner also claimed that appellate counsel was ineffective for failing to raise these claims on direct appeal.  The Michigan Court of Appeals denied leave to appeal on the ground that Petitioner had failed to establish entitlement to relief under Michigan Court Rule 6.508(D).  *See People v. Buggs*, No. 284185 (Mich. Ct. App. July 25, 2008).  On November 25, 2008, the Michigan Supreme Court denied leave to appeal for the same reason.  *See People v. Buggs*, 482 Mich. 1070 (2008) (table).

### C. The Habeas Petition and Responsive Pleading

Petitioner signed his habeas corpus petition on January 23, 2009, and filed the petition with the Clerk of this Court on February 6, 2009.  His grounds for relief read:

I.     It was ineffective assistance of counsel for trial counsel not to ask for a hearing to establish an independent basis for the in court identification.

5

II.    It violated defendant-appellant's right of confrontation to not
       allow him to cross-examine a witness on a fraudulent notice
       of alibi he filed with the court.

III.   The trial court abused its discretion in allowing the
       preliminary examination testimony of an endorsed res
       gestae witness, Carlett Macklin, to be read to the jury.

IV.    Trial counsel was deficient in failing to request the
       appointment of a DNA expert to assist in his defense.

V.     Trial counsel was deficient in failing to object to the
       testimony of the physician relative to the autopsy performed
       on the victim.  The physician who had performed the autopsy
       relocated out of state and her supervisor provided testimony
       based upon the photographs and records maintained in his
       department.

VI.    Appellate counsel was deficient in failing to file these issues
       in Defendant's direct appeal.

Respondent Barry Davis argues through counsel that the state appellate court's

decision on the first three habeas claims was objectively reasonable.  Respondent

maintains that the remaining three claims are barred from review by Petitioner's failure

to raise those claims during the direct appeal.

Procedural default is not a jurisdictional matter, *Trest v. Cain*, 522 U.S. 87, 89

(1997), and Petitioner's claims lack merit.  Moreover, analyzing the merits of Petitioner's

claims "is less complex than analyzing the procedural issues."  *Hudson v. Lafler*, 421 F.

App'x 619, 623 (6th Cir. 2011).  The Court therefore will bypass the threshold

procedural-default inquiry and proceed to decide the merits of Petitioner's claims.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for

persons in state custody is provided by 28 U.S.C. § 2254, as amended by the

6

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011).  Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an
>         unreasonable application of, clearly established Federal law,
>         as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable
>         determination of the facts in light of the evidence presented
>         in the State court proceedings.

28 U.S.C. § 2254(d).  "[W]here factual findings are challenged, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings are correct."  *Goodwin v. Johnson*, 632 F.3d 301, 308 (6th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1) and *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)).

A state court's decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id.* at 409.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Richter*, 131 S. Ct. at 786.  To obtain a writ of habeas corpus from a

7

federal court, state prisoners must show that the state court's ruling on their claims "was

so lacking in justification" that it resulted in "an error well understood and comprehended

in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

### III.  DISCUSSION

### A.  Trial Counsel

Petitioner alleges that his trial attorney was constitutionally ineffective.

Specifically, Petitioner claims that his attorney should have (1) requested a hearing on

the in-court identification of him, (2) requested appointment of a DNA expert, and (3)

objected to the substitution of a pathologist for the physician who performed the

autopsy.

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668 (1984),

is clearly established federal law for purposes of 28 U.S.C. § 2254(d).  *Cullen v.

Pinholster*, __ U.S. __, __, 131 S. Ct. 1388, 1403 (2011).  Under *Strickland*, an attorney

is constitutionally ineffective if "counsel's performance was deficient" and "the deficient

performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  To establish

deficient performance, a habeas petitioner must show "that counsel made errors so

serious that counsel was not functioning as the 'counsel' guaranteed the defendant by

the Sixth Amendment."  *Id.*  "Judicial scrutiny of counsel's performance must be highly

deferential."  *Id.* at 689.

To demonstrate that counsel's performance prejudiced the defense, a habeas

petitioner must show "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."  *Id.* at 694.  "*Strickland*

asks whether it is 'reasonably likely' that result would have been different.  This does

8

not require a showing that counsel's actions 'more likely than not altered the outcome,'"
but "[t]he likelihood of a different result must be substantial, not just conceivable."
*Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693 and 696). "The
standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when
the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations
omitted).

### 1.  The Identification of Petitioner

Petitioner claims that his attorney should have objected to the photo array and
line-up and moved for a hearing to determine whether there was an independent basis
for Larry Cobb's in-court identification of him. Petitioner asserts that the pretrial
procedures were conducive to irreparable misidentification and that there was no
independent basis for Cobb's identification of him because Cobb was not acquainted
with him and he viewed the shooter from a great distance.

The Michigan Court of Appeals adjudicated this claim on the merits and
determined that the pretrial identification procedure was not so suggestive as to lead to
a substantial likelihood of misidentification. The Court of Appeals concluded that
defense counsel was not required to advocate a meritless position and that counsel was
not ineffective for failing to request a hearing to establish an independent basis for the
in-court identification.

### a.  Clearly Established Federal Law

Due process protects against the admission of evidence derived from suggestive
identification procedures. *Neil v. Biggers*, 409 U.S. 188, 196 (1972). "[T]he primary evil
to be avoided is 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 198

9

(quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968)).  If the pretrial procedure

was impermissibly suggestive, the question is "whether under the 'totality of the

circumstances' the identification was reliable even though the confrontation procedure

was suggestive."  *Id.* at 199.

### b.  Application

As noted above, Larry Cobb identified Petitioner in a photo array and said that he

was eighty per cent sure of his selection.  At a subsequent line-up consisting of six

people, Cobb narrowed his choice to two people, one of whom was Petitioner, and at

trial, Cobb identified Petitioner as the shooter.

Petitioner has not alleged any basis for concluding that the photo array and

pretrial line-up were suggestive.  Nor does the record support the conclusion that either

procedure was suggestive.  Sergeant Mark Reaves testified at trial that the pictures

used in the photo array were selected by a computer on the basis of Petitioner's gender,

race, height, weight, age, and other factors.  The photos were presented to Larry Cobb

in black and white colors so that all the backgrounds would be similar.  When Sergeant

Reaves showed the array to Cobb, he informed Cobb that the person responsible for

the crime may or may not be in the photo array and that Cobb should pick someone

only if he were sure of his choice.  (Tr. Aug. 20, 2004, at 26 - 29.)

Sergeant Jowanne Carrigan testified that the live line-up was composed of men

who were similar to Petitioner in height, weight, and race.  All the men wore the same

type of clothing (Tr. Aug. 19, 2004, at 59), and the public defender who was present at

the line-up approved of it.  (Tr. Aug. 24, 2004, at 74.)

Petitioner does not dispute these facts, and the record does not indicate that the

10

photo array and live line-up were unfair.  Consequently, it was unnecessary to hold a hearing on whether there was an independent basis for Larry Cobb's in-court identification of Petitioner.  Defense counsel's failure to request such a hearing did not amount to deficient performance.

### 2.  Failure to Request Appointment of an Expert

Petitioner contends that his trial attorney was ineffective for failing to request appointment of a DNA expert to assist in his defense.  Petitioner asserts that the prosecution's case relied heavily on the testimony of its DNA expert and, without a defense expert, there was no way for his attorney to know whether the prosecution's expert witness was correct in his characterization of the evidence.

The trial court adjudicated this claim in its ruling on Petitioner's motion for relief from judgment.  The trial court stated that Petitioner had not shown how the appointment of a DNA expert would have helped him and that

> [t]here is no indication that the DNA evidence presented by the People was in any way false.  There is no evidence that the appointment of a defense expert would have altered the facts.  It may very well be that trial strategy dictated that defense counsel not request a second expert which would have bolstered the testimony presented by the People's expert. Further, the facts of this case disclose that defendant was identified as the shooter by an eyewitness, defendant had a motive, that motive being to kill the brother of the man who killed his brother.  Defendant does not establish that the appointment of a defense DNA expert would have given defendant a reasonable likely chance of acquittal on the facts of this case.

*People v. Buggs*, No. 04-13625-FC, at 5 (Genesee County Cir. Ct. May 11, 2007).

### a.  Clearly Established Federal Law

Although "in some cases counsel would be deemed ineffective for failing to consult or rely on experts, . . . that formulation is sufficiently general that state courts

would have wide latitude in applying it." *Richter*, 131 S. Ct. at 789.  *Strickland* does not

require an equal and opposite expert from the defense for every prosecution expert.  *Id*.

at 791.  "There are . . . 'countless ways to provide effective assistance in any given

case,'" and it is a rare situation "in which the 'wide latitude counsel must have in making

tactical decisions' will be limited to any one technique or approach."  *Id*. at 788-89

(quoting *Strickland*, 466 U.S. at 689).

### b.  Application

Petitioner's attorney did not request appointment of an expert witness, but he did

thoroughly cross-examine Jeffrey Nye, the State's expert witness.  The cross

examination comprises thirty-nine pages of the transcript of trial.  *See* Tr. Aug. 20, 2004,

at 134-74.  Among other things, defense counsel asked Nye how long it takes for DNA

to degrade and whether identical twins would have the same DNA.  (*Id*. at 134-35.)

These questions, no doubt, were meant to suggest that Petitioner's twin brother

contributed the DNA found on the football jersey in evidence.

Defense counsel also elicited testimony from Nye that Petitioner's DNA was not

found on the green tee shirt, that there could have been as many as five donors who

contributed the DNA on the football jersey, and that there were five different DNA types

on the gun.  (*Id*. at 137-40, 171.)  Defense counsel asked whether additional cuttings

and swabs from the football jersey and gun would have enabled Nye to determine if the

person who contributed the DNA on the green shirt was the same person as the person

who contributed DNA on the football jersey.  (*Id*. at 172-73.)  Defense counsel's cross-

examination of Nye was sufficient to expose weaknesses in Nye's presentation.

Defense counsel also discussed weaknesses in the DNA evidence during his

12

closing argument.  (Tr. Aug. 25, 2004, at 30, 43-51, 57-59.)  He argued that the DNA

evidence on the football jersey was not proof beyond a reasonable doubt and that it

proved nothing at all.  (*Id*. at 50-51.)

Defense counsel's decision to challenge the testimony of the prosecution's expert

witness, as opposed to requesting a defense expert, was reasonable strategy.  The use

of a defense expert could have "transform[ed] the case into a battle of the experts."

*Richter*, 131 S. Ct. at 790.  And to support a defense that the prosecution did not prove

its case, it is sometimes "better to try to cast pervasive suspicion of doubt than to strive

to prove a certainty that exonerates."  *Id*.

In conclusion, defense counsel was not ineffective for failing to request

appointment of a defense expert in DNA analysis.  "Counsel was entitled to formulate a

strategy that was reasonable at the time and to balance limited resources in accord with

effective trial tactics and strategies."  *Id*. at 789.

### 3.  Failure to Object to the Physician's Testimony

Petitioner's final claim about trial counsel alleges that counsel should have

objected to Dr. Qazi Azher's testimony.  Dr. Azher testified for Dr. Rachiel Land, who

performed the autopsy on Frederick Cheatom.  Dr. Land was not available to testify at

Petitioner's trial because she retired and moved to Pennsylvania.

Petitioner claims that Dr. Azher's testimony was inadmissible hearsay, which

violated his constitutional right of confrontation and his right to due process.  Petitioner

maintains that defense counsel should have objected to the substitution of Dr. Azher for

Dr. Land because Dr. Land's report and the bullet she recovered from the victim were

adversarial in nature and were used to establish the victim's cause of death and the

13

type of weapon.

The trial court adjudicated this claim when ruling on Petitioner's motion for relief from judgment. The trial court determined from the record that Dr. Azher "used the photographs and medical records obtained by his office to detail the injuries to the victim and the cause of death." *People v. Buggs*, No. 04-13625-FC, at 6 (Genesee County Cir. Ct. May 11, 2007). The trial court concluded that "[t]here was nothing inappropriate in this testimony." *Id*.

To the extent that Petitioner is attempting to assert an independent claim under the Confrontation Clause of the Sixth Amendment, his claim lacks merit because his attorney agreed to the substitution of Dr. Azher for Dr. Land. (Tr. Aug. 19, 2004, at 64). By agreeing to the substitution, he waived any right he had to confront Dr. Land. *See Melendez-Diaz v. Massachusetts*, __ U. S. __, __, 129 S. Ct. 2527, 2534 n.3 (2009) ("The right to confrontation may, of course, be waived, including by failure to object to the offending evidence . . . .").

As for defense counsel's failure to object to Dr. Azher's testimony, any objection likely would have been overruled, because the trial court qualified Dr. Azher as an expert in the field of pathology. Dr. Azher, moreover, explained to the jury that, although he did not perform the autopsy, he had reviewed Dr. Land's report and was prepared to interpret it. He then proceeded to summarize Dr. Land's autopsy findings regarding the gunshot wounds found on Frederick Cheatom's body. He stated that there were four entrance wounds, three exit wounds, and that one bullet was recovered from the body. Dr. Azher concluded his testimony by stating that the cause of death was multiple gunshot wounds and that the manner of death was homicide. (Tr. Aug. 20,

14

2004, at 6-15.)

There was nothing controversial about the autopsy findings, and neither the

cause of death, nor the manner of death were uncontested.  Defense counsel, in fact,

had no questions for Dr. Azher.  And even though defendants in criminal cases

generally have a right to confront the analyst who certified a forensic report, *see*

*Bullcoming v. New Mexico*, __ U.S. __, __, 131 S. Ct. 2705, 2710 (2011), *Bullcoming*

was decided long after Petitioner's trial.  Defense counsel therefore was not ineffective

for failing to object to Dr. Azher's testimony on constitutional grounds.

### 4.  Conclusion on Petitioner's Ineffective Assistance Claim

None of defense counsel's alleged shortcomings rose to the level of deficient

performance.  Thus, the state court opinions rejecting Petitioner's ineffective-

assistance-of-counsel claims were not contrary to, or unreasonable applications of,

*Strickland*.  Petitioner has no right to relief on the basis of his claims about trial counsel.

### B.  The Right of Confrontation

Petitioner alleges that the limitations placed on his cross-examination of Laron

Burns deprived him of his constitutional right of confrontation and his ability to show that

Burns was biased and not credible.  Burns was Petitioner's cell mate in jail.  He testified

at Petitioner's trial that Petitioner admitted to shooting Frederick Cheatom.  Defense

counsel moved *in limine* for permission to ask Burns about a notice of alibi that Burns

filed in his own criminal case.  Defense counsel argued that the notice was fraudulent

because Burns subsequently pleaded guilty in the case.  The trial court denied defense

counsel's request because the alibi notice was signed by Burns' attorney and the court

had no way of knowing what Burns had told his attorney unless it violated the

15

attorney/client privilege.  (Tr. Aug. 24, 2004, at 28.)

The Michigan Court of Appeals agreed with the trial court that the alibi notice was

not probative of truthfulness.  Accordingly to the Court of Appeals,

> [t]he fact that a defendant ultimately pleads guilty does not indicate that
> his prior alibi notice was fraudulent.  A defendant may file a notice,
> according to the requirement of MCL 768.20(1), to preserve his right to
> call the witness and later withdraw it for reasons unrelated to his
> trustworthiness.

*Buggs*, Mich. Ct. App. No. 258347, at 2.  The Court of Appeals concluded that  limitation

complained of did not deprive Petitioner of a fair trial or violate his right of confrontation.

## 1.  Clearly Established Federal Law

The Confrontation Clause of the Sixth Amendment to the United States

Constitution applies to the States and "guarantees the right of a criminal defendant 'to

be confronted with the witnesses against him.'  The right of confrontation includes the

right to cross-examine witnesses."  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)

(citing *Pointer v. Texas*, 380 U.S. 400, 404, 406-07 (1965)).  Cross-examination may be

used to test the believability of a witness and to reveal a witness's biases, prejudices,

partiality, or motivation for testifying.  *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974).

Trial courts, however, have broad discretion to limit the scope of cross-examination by

precluding "repetitive and unduly harassing interrogation."  *Id.* at 36.

> Where it is merely the *extent* of cross-examination that is limited, the trial
> judge retains a much wider latitude of discretion, though of course that
> discretion may be abused.
>
>   [T]he test in such circumstances is whether the jury had enough
> information, despite the limits placed on otherwise permitted
> cross-examination, to assess the defense theory.  "[O]nce
> cross-examination reveals sufficient information to appraise the witnesses'
> veracity, confrontation demands are satisfied."

16

*Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (citations omitted).

### 2.  Application

Laron Burns admitted to the jury that he was a jail detainee and that his criminal case had not been resolved.  Both the prosecutor and defense counsel questioned Burns as to whether he expected to derive a benefit from his testimony.  (Tr. Aug. 24, 2004, at 46-47, 51-52.)  He denied being promised anything for his testimony, but the jury could have inferred that he probably hoped to receive some future consideration for his testimony.

The jury had enough information, despite the limits placed on defense counsel's cross-examination of Burns, to appraise Burns' credibility and to assess the defense theory that Burns was not credible.  Therefore, Petitioner's right of confrontation was not violated.

Even if constitutional error occurred, there was other substantial evidence implicating Petitioner in the crime.  He was identified as the shooter by Larry Cobb; his DNA was found on the shirt which the shooter discarded after the shooting; his DNA also was found on the gun used in the shooting; and he confessed to Corey Wilson that he shot the victim.  The alleged constitutional error could not have had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), and was harmless.

### C.  Use of Testimony from the Preliminary Examination

Petitioner claims that the trial court abused its discretion when it permitted the prosecution to read into the record Carlett Macklin Gardner's testimony from the preliminary examination.  Ms. Gardner testified at Petitioner's preliminary examination

17

that Petitioner looked familiar to her, but she was unable to say whether he was the

man whom she saw on August 24, 2001, because she did not see his entire face at the

time. Ms. Gardner failed to appear for trial, and Petitioner claims that the prosecution

failed to use due diligence to produce her. The Michigan Court of Appeals concluded

on review of this claim that the trial court did not abuse its discretion in admitting Ms.

Gardner's preliminary examination testimony.

This Court finds no merit in Petitioner's claim because it alleges a mere violation

of state law. "A federal court may not issue the writ [of habeas corpus] on the basis of a

perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *accord Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

Furthermore, there was a valid basis for the trial court's conclusion that the

prosecution made a good faith effort to locate Ms. Gardner. As explained by the

Michigan Court of Appeals,

> a police officer and a witness coordinator from the prosecutor's office
> testified that they spoke with the witness the day after the trial commenced
> and verified that she had received her subpoena and that she was going
> to be at the trial. They testified that the witness expressed transportation
> and timing issues, but otherwise agreed to attend the trial. Later that day,
> the witness had someone else call to say she did not plan on attending. A
> warrant was issued immediately and the Detroit Police Department was
> contacted to secure the witness who was known to reside in Detroit. The
> local authorities testified that they were in continued contact with the
> Detroit Police Department verifying the actions taken and whether those
> actions were successful.

*Buggs*, Mich. Ct. App. No. 258347, at 3; *see also* Tr. Aug. 24, 2004, at 3-24 (the trial

court's due diligence hearing).

Although the Constitution guarantees defendants in criminal cases the right "to

be confronted with the witnesses against him," U. S. Const. amend. VI, this right does

18

not impose on prosecutors the duty to produce a particular witness. *United States v. Bryant*, 461 F.2d 912, 916 (6th Cir. 1972) (citing *United States v. Polisi*, 416 F.2d 573, 579 (2d Cir. 1969)).  The Confrontation Clause, moreover, permits the admission of testimonial statements when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).  Ms. Gardner was unavailable at Petitioner's trial, and Petitioner's trial attorney had an opportunity to cross-examine her at the preliminary examination.  Therefore, even if Petitioner had raised his claim under the Confrontation Clause, the use of the preliminary examination transcript did not violate his right of confrontation.

### D.  Appellate Counsel

Petitioner's sixth and final claim alleges that appellate counsel was deficient for failing to all of Petitioner's claims on direct appeal.  Petitioner claims that the issues which were not raised on direct appeal were significant, obvious, and much stronger than the issues that were raised.

The trial court adjudicated this issue when ruling on Petitioner's motion for relief from judgment.  The trial court stated that, because the issues raised in Petitioner's post-judgment motion lacked merit, appellate counsel had no obligation to raise the issues and, in fact, acted appropriately in not raising the issues.  The court also stated that, even assuming that appellate counsel should have raised the issues, Petitioner had not shown actual prejudice as a result of the deficient performance, because he did not have a reasonably likely chance of acquittal.  The court concluded that appellate counsel was not ineffective in failing to raise meritless issues.

### 1.  Clearly Established Federal Law

19

The proper standard for evaluating Petitioner's claim about appellate counsel is that enunciated in *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Therefore, Petitioner must demonstrate that his appellate attorney's performance was deficient and that the deficient performance prejudiced Petitioner's defense. *Strickland,* 466 U.S. at 687.

The "deficient performance" prong of the two-part *Strickland* test requires showing that appellate counsel made an objectively unreasonable decision to raise other issues in place of Petitioner's claims. *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 285 (6th Cir. 2010). Petitioner must show that his claims are clearly stronger than the issues counsel presented to the Michigan Court of Appeals. *Id.* (quoting *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009) (quoting *Robbins*, 528 U.S. at 285, 288). To demonstrate "prejudice," Petitioner must show a reasonable probability that he would have prevailed if his attorney had raised all his claims on appeal. *Id.* (citing *Robbins*, 528 U.S. at 285).

## 2. Application

The two claims that could have been raised on direct appeal and were not raised are the claims that trial counsel was deficient for failing to seek an expert witness and for failing to object to Dr. Azher's testimony. This Court determined above that neither of these claims had merit, and even if the claims are not frivolous, Petitioner was not entitled to compel his attorney to raise all nonfrivolous claims on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Appellate counsel's performance did not amount to deficient performance, because the omitted claims are not clearly stronger than the issues counsel did present to the Michigan Court of Appeals. And because Petitioner

20

has not shown that he would have prevailed on appeal if his attorney had raised all his claims on appeal, he has not demonstrated that his attorney's performance prejudiced him.  Thus, he is not entitled to relief on the basis of his claim about appellate counsel.

## IV.  CONCLUSION

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to, or an unreasonable application of, Supreme Court precedent. Accordingly, the petition for writ of habeas corpus [dkt. #1] is **DENIED**.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  A petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).

Reasonable jurists would not debate the Court's resolution of Petitioner's constitutional claims.  The Court therefore declines to grant a certificate of appealability. Petitioner nevertheless may proceed *in forma pauperis* in the Court of Appeals because an appeal could be taken in good faith.  28 U.S.C. § 1915(a)(3).


s/Gerald E. Rosen_____
Chief Judge, United States District Court

Dated: August 31, 2011

21

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 1, 2011, by electronic mail and upon Tyrese Buggs, #419876, Saginaw Correctional Facility, 9625 Pierce Road, Freeland, MI 48623 by ordinary mail.

s/Ruth A. Gunther
Case Manager